UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

Jamie FAVARO,     Barbara ROSS,     Philipp
RASSMAN,  Marilyn HORAN,   Peter MEITZLER,
and Michael GREEN,

                                                    Plaintiffs,

                        -against-

THE CITY OF NEW YORK, Raymond KELLY,
POLICE COMISSIONER OF THE NEW YORK
CITY POLICE DEPARTMENT, NEW YORK CITY
POLICE DEPARTMENT, P.O. JOHN and JANE
DOE individually and in their official capacities,   (the
names John and Jane Doe being fictitious, as the true
names  and number are presently unknown),

                                                    Defendants.

-----------------------------------------------------------------X

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

**08 Civ. 01855 (SAS)**

## PRELIMINARY STATEMENT

1)  This is a civil rights action brought to vindicate the Plaintiffs' rights under the First,

Fifth and Fourteenth Amendments of the Constitution of the United States, and under the

Civil Rights Act, 42 U.S.C. Section 1983.

2)  Plaintiffs Jamie FAVARO, Barbara ROSS, Philipp RASSMANN, Marilyn HORAN,

Peter MEITZLER, and Michael GREEN's rights were violated when officers of the

NEW YORK CITY POLICE DEPARTMENT unconstitutionally and without any legal

basis seized Plaintiffs' bicycles which were associated with a Critical Mass bicycle ride

and were locked to public lamp posts, public parking meters, scaffolding and/or parked

on their kickstands.  By reason of defendants' actions, including their unreasonable and

unlawful conduct, and their policy and practice of seizing bicycles without any legal

basis, Plaintiffs were deprived of their constitutional rights.

3)  Plaintiffs also seek an award of compensatory, punitive damages, and attorney's fees.

## JURISDICTION AND VENUE

4)  This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and the First, Fifth, and Fourteenth Amendments of the Constitution of the United States.

5)  Venue is proper pursuant to 28 U.S.C. §1391(b) in that Plaintiffs' claim arose in the Southern District of New York.

6)  An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

## PARTIES

7)  Plaintiff Jamie FAVARO is a resident of New York County in New York State.

8)  Plaintiff Barbara ROSS is a resident of New York County in New York State.

9)  Plaintiff Philipp RASSMANN is a resident of New York County in New York State.

10) Plaintiff Marilyn HORAN is a resident of New York County in New York State.

11) Plaintiff Peter MEITZLER is a resident of Kings County in New York State.

12) Plaintiff Michael GREEN is a resident of Kings County in New York State.

13) Defendant, THE CITY OF NEW YORK, is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The defendant assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by THE NEW YORK CITY POLICE DEPARTMENT ("NYPD").

14) Defendant RAYMOND KELLY ("KELLY") has been the Police Commissioner of the NYPD since January 2002, and was acting in such capacity at all times relevant herein. He is sued in his official capacity.

15) Defendants NYPD OFFICERS JOHN DOE and JANE DOE(hereinafter, "JOHN DOE and JANE DOE") and other unidentified police officers (the "Individual Defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.  OFFICERS JOHN DOE and JANE DOE and the Individual Defendants are being sued herein in their individual and official capacities.

**16)** At all times relevant herein, the Individual Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

## STATEMENT OF FACTS

17) Critical Mass rides ("Rides"), which are comprised primarily of bicycles but contain other non-polluting transportation as well, take place on the last Friday of every month in approximately four hundred (400) cities worldwide.  They have taken place in Manhattan since 1994.  Although the Manhattan Rides initially had few participants ("riders"), participation increased sharply at the beginning of this decade, "consistently attract[ing] over 1,000 cyclists in the summer of 2003."  *See*, Bray v. City of New York, 346,

F.Supp.2d 480, 483 (S.D.N.Y. 2004)(enjoining above-named Defendants from seizing unattended bicycles associated with subsequent Rides)(Herein after "Bray I" and attached as Exhibit 1).

18) In the summer of 2004, the monthly Rides in Manhattan attracted upwards of five thousand (5,000) Riders, with fewer cyclists attending the months following the 2004 Republican National Convention in New York City.  See, id at 484 (approximately four thousand (4,000) cyclists on the July 30 Ride, approximately five thousand (5,000) cyclists on the August 27, 2004 Ride, approximately one thousand two hundred (1,200) on the September 24 Ride).

19) Most Manhattan Riders assemble at Union Square Park beginning around 7:00 p.m. on the last Friday of every month.  The Rides are advertised on the internet and by bicycle and environmental advocacy groups such as Time's Up! and Transportation Alternatives.  See id.

20) Rides celebrate what cities could look like if more focus were given to bicycling and the resultant environmental benefits from a decreased reliance on carbon-based fuels for daily transportation.

21) While many groups promote participation in the Manhattan Rides, there are no Ride leaders, routes, or dictates on the character of the Ride.  Participants join in the Ride on a spontaneous, ad hoc basis.  *See*, id.

22) The Rides started in 1992 in San Francisco and were initially intended as a means for cyclists to commute home from work in a group, assuring at least one lane of traffic would be designated for bicycles.  The Rides gained popularity quickly that within a year,

one thousand (1,000) participants made the monthly Friday-evening ritual a festive display of instant, human-powered, non-polluting community.

23) While the Rides' messages are traditionally related to environmental and bicycle safety issues, there are as many reasons to ride as there are Riders: the Ride has no commercial undertone; it is a great form of exercise; the bonds and friendships forged on the Ride often develop across class and race lines, with individuals unlikely to come together in other quotidian settings; some Riders seek to make a visual statement about global warming or wars in the Middle East, while others seek a safe, fun bicycle ride to start their weekend.

24) In 1998, when few others believed that Rides were possible on New York City's streets, the Time's Up! environmental and bicycle advocacy group publicized the event in local bike shops, and by tagging fliers to bicycles locked up outside. When the group started advertising for themed rides – the Community Garden ride in April 2000 was the first Ride to attract over two hundred (200) cyclists, many outfitted as ladybugs and flowers – the Ride gained in popularity.

25) By the summer of 2003, when community bicycle organizers hosted the immensely popular New York Bicycle Summer month of Rides, the Manhattan Ride grew to eight hundred (800) participants in June, and one thousand five hundred (1,500) participants in July. *See*, id.

26) In 2004, more and more city cyclists attempted to deliver a message to the city: cycling is a vibrant and vital activity in New York, and cyclists' rights and safety need to be bigger priorities for city policymakers and politicians.

27) On August 27, 2004, three (3) days before the Republican National Convention, approximately five thousand (5,000) cyclists participated in the Manhattan Ride. *See*, id.

28) The NYPD made two hundred and sixty four (264) arrests that evening and confiscated the bicycles of those arrested. *See*, id.

29) The seized bikes were held by the police on the purported basis that they were "evidence" of the crime. However, on September 17, 2005, the District Attorney, New York County, began releasing the bikes to their owners. *See*, e.g. id at 485.

30) Neither at the time that the NYPD invoked the policy and seized those bicycles, nor at anytime thereafter have any charges been lodged against the Riders for violating any law or regulation that justified such seizure, nor has any notice ever been served that the NYPD had lawfully taken possession of these bicycles. *See*, id.

31) Upon information and belief, as justification for this policy, the NYPD has wrongfully asserted they took possession of these bicycles because they believed such bicycles to be "abandoned" notwithstanding they knew such bicycles had not been abandoned and that in many instances, the owners displayed keys to locks at the time the NYPD determined to cut the locks or chains affixed to the bicycles.

32) Upon information and belief, thereafter, the NYPD modified its rationale for such policy stating, "abandoning their bicycles is a tactic that won't work. People who break the law have to face the consequences. This is one of them."

33) At no time, however, has the NYPD charged the Riders/owners of such bicycles with violating any law or that such seized bicycles were involved in the commission of any crime.

34) The seizure of the bicycles on the pretext that such bicycles were abandoned – when the NYPD knew that such was not the fact – or as arbitrary punishment for having associated with the Ride is without basis in law and is a wrongful taking of property without due process of the law.

35) The Defendants collectively and individually knew their actions violated the Due Process Clause of the 14th Amendment because of the above-cited <u>Bray v. City of New York</u>, 346 F. Supp. 2d 480, 489 (S.D.N.Y. 2004), rendered on October 28, 2004, which preliminarily enjoined the above-named defendants from seizing unattended bicycles associated with future Rides.

## PLAINTIFF Jamie FAVARO

36) PLAINTIFF Jamie FAVARO ("Ms. FAVARO") resides at 149 East Broadway, Apartment No. 4, New York, New York 10002.

37) Ms. FAVARO's bicycle was a blue Raleigh Grand Prix. A photograph of Ms. FAVARO with her bicycle is attached hereto as Exhibit 2.

38) Ms. FAVARO rode her bicycle in the March 25, 2005 Ride. She was riding west with the other cyclists on West 17th Street. As she reached the end of the block, a group of NYPD officers on scooters blocked the end of the street.

39) Ms. FAVARO got off her bicycle, out of the street, onto the sidewalk and locked her bike to a publicly owned sign post, hoping that she could leave the area, come back later and to retrieve her bicycle.

40) Ms. FAVARO saw a NYPD officer with a power saw, cutting her chain and seizing her bicycle. This encounter was memorialized in photographs, attached hereto as Exhibit 3 and Exhibit 4.

41) The police officer then loaded her bike onto an NYPD bus.

42) Ms. FAVARO was not charged with any criminal acts in connection with the Ride.

43) Ms. FAVARO was deprived of her property from March 25, 2005 until April 5, 2005.

### PLAINTIFF Barbara ROSS

44) PLAINTIFF Barbara ROSS ("Ms. ROSS") resides at 114 Ridge Street, Apartment No. 3F, New York, New York 10002.

45) Ms. ROSS' bicycle is a black picnica, characteristic for its ability to be folded into a compact, portable form. A picture of the bicycle is attached hereto as Exhibit 5.

### A. August 2004 Ride – Confiscation Number One

46) On the August 26, 2004 Ride, Ms. ROSS rode her bicycle in a group of about three (300) cyclists who departed Union Square Park heading south on Broadway. As the Riders approached Astor Place, several NYPD officers and their scooters blocked the cyclists' route. In order to avoid an unnecessary arrest for her association with the Ride, Ms. ROSS placed her bicycle against a wall and walked away.

47) Ms. ROSS' bicycle was seized by unknown NYPD officers. A picture of Ms. ROSS' bicycle in police custody after the August Ride is attached hereto as Exhibit 6.

48) After the Ride, Ms. ROSS, accompanied by counsel, traveled to the Ninth Precinct to recover her property, as she had been given no notice of the justification for its seizure. Inside the precinct, Ms. ROSS was permitted to visually confirm that her bicycle was in police custody, but her bicycle was nonetheless retained by the NYPD. The NYPD did, however, return to Ms. ROSS the lock and bag that she left in her bicycle basket.

49) Ms. ROSS was neither charged nor cited with any violations of the law in connection with the Ride.

50) For nearly the next six months, the NYPD Property Clerk at the Ninth Precinct repeatedly told Ms. ROSS that missing paperwork was preventing the NYPD from releasing her bicycle from their custody.  However, after informing the Property Clerk of her intention to sue, she was allowed to recover her bicycle after producing a photograph of it.  Ms. ROSS was deprived of the use and enjoyment of her bicycle from August 26, 2004 to March 14, 2005.

### B.  March 2005 Ride – Confiscation Number Two

51) Less than two weeks after the NYPD returned Ms. ROSS' bicycle to her, she attended the Ride of March 25, 2005.  Departing from Union Square Park heading west on 17th Street with other Riders, she noticed that NYPD officers had boxed them in between Fifth and Sixth Avenues.

52) Ms. ROSS got off of her bicycle and brought it onto the sidewalk. NYPD officers then confiscated her bicycle.

53) Ms. ROSS was not charged with any criminal acts in connection with the Ride.

54) Ms. ROSS was deprived of her property from March 25, 2005 until April 5, 2005.

### PLAINTIFF Philipp RASSMANN

55) PLAINTIFF Phillip RASSMANN ("Mr. RASSMANN") resides at 285 Fort Washington Avenue, Apartment No. 24, Brooklyn, New York, 10032.

56) Mr. RASSMANN's bicycle is a vintage-style roadbike with an orange-brown frame and fenders.  A photograph of Mr. RASSMANN with his bicycle, pictured on the far left, is attached hereto as Exhibit 7.

57) On the March 25, 2005 Ride, Mr. RASSMANN was proceeding west on his bicycle on West 17th Street between Fifth Avenue and Sixth Avenue when NYPD officers blocked the Ride and began arresting some cyclists, confiscating their bicycles.

58) NYPD officers also seized Mr. RASSMANN's bicycle.

59) Mr. RASSMANN was neither charged nor cited with any violations of the law in connection with the Ride.

60) Mr. RASSMANN was deprived of the use and enjoyment of his bicycle from March 25, 2005 to April 2, 2005.

## PLAINTIFF Marilyn HORAN

61) PLAINTIFF Marilyn HORAN ("Ms. HORAN") resides at 67 East 2nd Street, Apartment No. 32, New York, New York 10003.

62) Ms. Horan's bicycle is a boys' Peugeot hybrid with 27" slim tires and 16" tall u-shaped handlebars.  The bicycle reads "Peugeot" in front, below the handlebars.  The rest of the frame is covered in peeling contact paper, some of which is red and some of which is black-and-white checkered.  On the date in question, there was a black u-lock on the bicycle and a bell on the left handlebar.  A photograph of the bike is attached hereto as Exhibit 8.

63) On the night of Friday, February 25, 2005, at approximately 8:40 PM, her bicycle was taken by JOHN and JANE DOE officers of the NYPD from the sidewalk on the west side of Broadway between 26th and 27th Streets.

64) Ms. Horan's bicycle was seized near the area of several arrests of bicyclists at that location. It was subsequently loaded onto an NYPD flatbed truck, a photo of which is attached hereto as Exhibit 9.

65) Because she was not arrested or issued a summons or any paperwork of any kind when her bicycle was seized, she still does not have any information whatsoever as to recover her property nor have the Defendants informed her of the required procedure to recover her property.

66) She has called the Property Clerk at the Ninth Precinct, because she understood that the people who were arrested on the night in question were processed there, but the Property Clerk was not able to locate her bicycle.

67) Ms. HORAN has personally searched the NYPD's bicycle warehouse at 520 Kingsland Avenue in Greenpoint, Brooklyn and has been unable to locate her bicycle.

68) Ms. HORAN was neither charged nor cited with any violations of the law in connection with the Ride.

69) Ms. HORAN has been permanently deprived of the use and enjoyment of her bicycle, as the NYPD have failed to return her property.

## PLAINTIFF Peter MEITZLER

70) PLAINTIFF Peter MEITZLER ("Mr. MEITZLER") resides at 88 Eagle Street, Brooklyn, New York 11222.

71) Mr. MEITZLER owns a purple tandem Schwinn bicycle from the 1960's.

72) Mr. MEITZLER uses this bicycle frequently to take friends on bike rides who are often too intimidated by city traffic to ride a bicycle alone.

73) Mr. MEITZLER spent time and money restoring this unusual bicycle to safe working condition.

74) Mr. MEITZLER partially followed the February 25, 2005 Ride on his bicycle in order to document the Ride with photographs. At one point during the Ride, he broke away

from the group and biked alone to Times Square to set up his camera, where he guessed, based on prior routes, the Ride would pass through on its way downtown.

75) At approximately 8:25 PM, the Ride passed him as he waited by the curb in Times Square. He took a few pictures and then attempted to catch up to the ride, but was slowed as he waited for the traffic signals. As he neared the rear of the Ride, he passed several NYPD vans following behind the last Rider. At this time, due to traffic, he was on the right side of the road. As soon as it was reasonably safe to do so, he moved over to the bicycle lane provided on the east side of Broadway.

76) At approximately 8:40 p.m. a group of four (4) or more NYPD officers on scooters suddenly appeared going against traffic, traveling up Broadway and aimed directly at those cyclists in front of Mr. MEITZLER traveling in the bicycle lane. The officers proceeded to force the cyclists to a stop, pinning them at the turn onto West 26th Street.

77) There were NYPD vehicles following the three NYPD vans, including a sport utility vehicle with a NYPD insignia on its door that jumped the curb and proceeded to block the sidewalk.

78) Mr. MEITZLER dismounted his bicycle and moved to the closest curb just north of West 26th Street and Broadway, where he lowered the kickstand and parked his bicycle.

79) He moved closer to those Riders, who by this time were being detained by officers, in order to document what was happening: the arrest of these same Riders and seizure of their bicycles.

80) While he was standing ten (10) feet away from Mr. MEITZLER, an NYPD officer placed his hand on Mr. MEITZLER's bicycle and moved it to the collection of other bicycles seized and temporarily gathered on the sidewalk.

81) Later, another NYPD officer lifted the bicycle and handed it to another NYPD official, who loaded it onto a flatbed truck.  Photographs are attached as Exhibit 10.

82) He did not intervene while the NYPD officers took his property because he feared that he would be arrested if he asserted his property rights.

83) When he went inside, he saw his bicycle in a room with nine (9) other bicycles, although the NYPD did not return his bicycle to him at that time.

84) Mr. MEITZLER was neither charged nor cited with any violations of the law in connection with the Ride.

85) Mr. MEITZLER was deprived of the use and enjoyment of his bicycle from February 25, 2005 to April 5, 2005.

## PLAINTIFF Michael GREEN

86) Plaintiff Michael GREEN ("Mr. GREEN") is a resident of 746 Driggs Avenue, Apartment GRD, Brooklyn, New York, 11211.

87) Mr. GREEN owns a road bicycle with a bright orange frame, much of which is wrapped with black tape.  This bicycle also features bullhorn handlebars and black rims. A photograph of Mr. GREEN's bicycle is attached hereto as Exhibit 11.

88) During the March 25, 2005 Ride, Mr. GREEN rode his bicycle west from Union Square Park on 17th Street, towards Fifth Avenue following a group of approximately fifty (50) Riders.  As a portion of the Ride approached Fifth Avenue, Mr. GREEN noticed NYPD officers deploying orange netting to prevent the Ride from proceeding south on Fifth Avenue, forcing the Ride to continue west on West 17th Street.  The police also blocked the Ride on West 17th Street as it approached Sixth Avenue, trapping the cyclists on West 17th Street between Fifth Avenue and Sixth Avenue.

89) NYPD officers prevented Mr. GREEN and other cyclists trapped on West 17th Street from leaving the area.   Mr. GREEN then locked his bicycle to scaffolding on West 17th Street, placing his helmet on his bicycle and remaining near it.

90) As NYPD officers arrested several cyclists and confiscated their bicycles on West 17th Street, they began to approach the area near Mr. GREEN and his bicycle.  Mr. GREEN said to one Officer McCarthy, "Are you going to steal bikes?" The officer replied, "Tell all your friends that you can have a choice. You can step forward and claim you bike and be given a summons. You will then be able to leave with your bike. Or, we will take the bikes." Mr. GREEN said, "But that would be theft." He said, "I guess that is what we'll do then."

91) Mr. GREEN observed NYPD officers use a power saw to cut the chain of his bicycle lock and load the bicycle onto an NYPD flatbed truck with other confiscated bicycles.  A picture of Mr. GREEN's bicycle on the NYPD flatbed truck is attached hereto as Exhibit 12.

92) Mr. GREEN also observed a man from Philadelphia, unassociated with the Ride, walk onto 17th Street to find his bicycle had been confiscated by NYPD officers. Officers returned this man's bicycle to him, presumably because of his non-association with the Ride.

93) Mr. GREEN was neither charged nor cited with any violations of law in connection with the Ride.

94) Mr. GREEN was deprived of the use and enjoyment of his bicycle from March 25, 2005 to April 1, 2005.

## MONELL CLAIM

95) The actions and conduct herein arose from a policy, practice and/or custom by which the Defendants, THE CITY OF NEW YORK and KELLY knew that the manner in which the bicycles associated with the Rides were being seized was unconstitutional and unlawful.  *See*, id at 491 ("Because of the City's failure to provide Plaintiffs with notice of the charges against them, Plaintiffs are likely to succeed on the merits of their due process claims.  Accordingly, a preliminary injunction is warranted to prevent a recurrence of bicycle seizures as they occurred on September 24.").

96) As a consequence of this policy, practice and/or custom of indifference and omission with regard to unconstitutionally and unlawfully seizing bicycles associated with the Rides, Plaintiffs' bicycles were wrongfully seized.  *See*, Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

97) At all times herein, the individual defendants were acting within the apparent scope of their employment with the knowledge and consent of their superiors and THE CITY OF NEW YORK.

98) The seizing of plaintiffs' bicycles was far in excess of their rightful authority as officers of the NYPD. The seizing of the bicycles associated with the Rides was made without proper cause.  *See*, Bray I  at 491.

99) The unconstitutional and unlawful seizing of plaintiffs' bicycles by defendants caused plaintiff to sustain pain and suffering and psychological and emotional trauma.  See id at 489 (holding that above-named defendants irreparably harmed plaintiffs whose bicycles were seized without legal justification).

## AS AND FOR A FIRST CAUSE OF ACTION
### (Fifth and Fourteenth Amendment-Due Process)

100)    Plaintiffs repeat and reallege each and every allegation contained in the forgoing paragraphs with the same force and effect as though more fully set forth herein again at length.

101)    The defendants' actions as alleged herein were committed under color of law.

102)    The actions, conduct and policies and practices of defendants as alleged herein violated Plaintiffs' rights not to have their property taken by defendants without due process of law under the Fifth and Fourteenth Amendments to the Constitution of the United States and the Civil Rights Act of 1871, Title 42 U.S.C. §1983.

103)    As a result of the acts alleged herein, plaintiffs have been damaged in a sum not less than $100,000.

## AS AND FOR A SECOND CAUSE OF ACTION
### (First Amendment- Right of Association)

104)    Plaintiffs repeat and reallege each and every allegation contained in the forgoing paragraphs with the same force and effect as though more fully set forth herein again at length.

105)    The defendants' actions as alleged herein were committed under color of law.

106)    The actions, conduct and policies and practices of defendants as alleged herein violated Plaintiffs' rights not to have their property taken by defendants because of their association with the Ride under the First Amendment to the Constitution of the United States and the Civil Rights Act of 1871, Title 42 U.S.C. §1983.

107)    As a result of the acts alleged herein, Plaintiffs have been damaged in a sum not less than $100,000.

## JURY DEMAND

108)    Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief as follows:

1. That this court issue a declaration that defendants have violated the Plaintiffs' rights under the First, Fifth and Fourteenth Amendments of the Constitution of the United States and the Civil Rights Act of 1871, Title 42 U.S.C. §1983.

2. That this Court enter an Order directing defendants to return any and all seized bicycles associated with the Ride.

3. That the jury finds and the Court adjudge and decree that Plaintiffs shall recover compensatory damages in the sum of no less than $100,000 jointly and severally, together with interest and costs, and punitive damages to Plaintiffs, in the sum of no less than $100,000 each against the individual defendants, jointly and severally.

4. That this Court order the Defendants to pay costs and attorneys' fees pursuant to 42 U.S.C. §1988; and

5. That this Court order any further relief the Court deems appropriate.

Dated:          March 17, 2008
                New York, NY

                                        Respectfully Submitted,


                                By:     _____
                                        David B. Rankin (DR 0863)
                                        *Attorney for Plaintiffs*
                                        350 Broadway, Suite 700
                                        New York, NY 10013
                                        t:212-226-4507

# Exhibit 1

3 of 3 DOCUMENTS

REBECCA BRAY, THOMAS STEPHANOS, JUSTIN McSIMOV, DAN FENNESSEY,
and ALLEN REGAR, Plaintiffs,-v-THE CITY OF NEW YORK, RAYMOND KELLY,
Police Commissioner of the New York Police Department, NEW YORK CITY POLICE
DEPARTMENT, NEW YORK CITY POLICE OFFICERS JOHN AND JANE DOE
(names and number of whom are unknown at present) and OTHER UNIDENTIFIED
MEMBERS OF THE NEW YORK CITY POLICE DEPARTMENT, Defendants.

04 Civ. 8255 (WHP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW
YORK

*346 F. Supp. 2d 480; 2004 U.S. Dist. LEXIS 21661*

October 28, 2004, Decided
October 28, 2004, Filed

**SUBSEQUENT HISTORY:** Motion granted by *Bray v.
City of New York*, 2004 U.S. Dist. LEXIS 24938 (S.D.N.Y.,
Dec. 13, 2004)

**DISPOSITION:** Plaintiffs' motion for preliminary in-
junction granted in part. Defendant's motion for prelimi-
nary injunction denied.

**LexisNexis(R) Headnotes**

**COUNSEL:**    [**1]    For Rebecca Bray, Thomas
Stephanos, Justin McSimov, Dan Fennessey, Allen Regar,
Plaintiffs: Steven J. Hyman, McLaughlin and Stern, LLP,
NY, NY.

For City of New York, Raymond Kelly, Police
Commissioner of the New York City Police Department,
New York City Police Department, Counter Claimants:
Robin Binder, Office of the NYC Law Department, New
York, NY.

For Rebecca Bray, Thomas Stephanos, Justin McSimov,
Dan Fennessey, Allen Regar, Counter Defendants: Steven
J. Hyman, McLaughlin and Stern, LLP, NY, NY.

**JUDGES:** WILLIAM H. PAULEY III, District Judge.

**OPINIONBY:** WILLIAM H. PAULEY III

**OPINION:**

[*483] MEMORANDUM AND ORDER

WILLIAM H. PAULEY III, District Judge:

Plaintiffs are participants in Critical Mass, a bike rid-
ing phenomenon in major cities worldwide on the last
Friday of every month. The next Critical Mass bike
ride will take place tomorrow night, October 29, 2004.
Plaintiffs move to preliminarily enjoin the Defendants
(collectively, the "City") from seizing bicycles of Critical
Mass participants who are not charged with a crime or
violation of law. The City counters with its own request
for a preliminary injunction prohibiting Plaintiffs and all
others with notice from participating [**2] in Critical
mass bike rides without a parade permit. For the reasons
that follow, Plaintiffs' motion for a preliminary injunction
is granted in part, and the City's motion for a preliminary
injunction is denied.

BACKGROUND

Critical Mass bike rides take place in approximately
400 cities on the last Friday of each month. (Compl. PP
16, 17.) They are touted as a means of promoting "the
rights of bicyclists and the rights of pedestrians on their
own streets" and focusing attention on the "deteriorating
quality of life – starting with the toxic levels of air and
noise pollution – that cars create for cities." (Declaration
of Lt. Daniel Alabano, dated Oct. 25, 2004 ("Albano
Decl.") Ex. A: www.times-up.org/cm.php.)

Critical Mass bike rides in Manhattan began in 1994.
(Albano Decl. P 3; Compl. P 18.) Initially, the rides at-
tracted few participants; however, in the last two years,
their popularity has soared. (Declaration of Asst. Chief
Bruce Smolka, dated Oct. 25, 2004 ("Smolka Decl.") P
3.) In 2003, the Village Voice deemed Critical Mass bike
riders the "Best Disruption of Traffic in New York" and
described them as cycling for two hours "wherever their
wheels take them." (Albano [**3] Decl. Ex. A.) Critical

Page 2

346 F. Supp. 2d 480, *483; 2004 U.S. Dist. LEXIS 21661, **3

Mass bike rides consistently attracted over 1,000 cyclists in the summer of 2003. (Compl. P 18; Answer P 31.) Because of the ad hoc nature of these events, [*484] the police have improvised on occasion, escorting Critical mass bike rides to ensure the safety of cyclists and pedestrians. (Smolka Decl. P 13.)

In the summer of 2004, Critical Mass bike rides reached a new crescendo. For example, the July 30th bike ride, attracted approximately 4,000 participants. (Smolka Decl. P 5.) On the eve of the Republican National Convention in New York, 5,000 cyclists participated in the August 27th bike ride. (Smolka Decl. P 6.) The September 24th Critical Mass bike ride drew approximately 1,200 participants. (Smolka Decl. P 9.)

Traditionally, the October Critical Mass bike ride is a popular event that coincides with Halloween, and cyclists are encouraged to come in costume to "maintain[] a positive and fun vibe." (Smolka Decl. Ex. B.) Plaintiffs anticipate that the gravitational pull of Halloween in New York will attract a larger than average group of participants for the October 29th ride. (Draft Transcript of Hearing dated Oct. 27, 2004 ("Tr.") at 10.)

New York participants [**4] in Critical Mass bike rides assemble at Union Square Park at 7:00 p.m. (Albano Decl. Ex. A.) The events are advertised on the Internet and by environmental and bicycle advocacy groups such as Time's Up! and Transportation Alternatives. (Albano Decl. Exs. A-C; Smolka Decl. P 8.) However, Critical Mass has no leader: "It's an event, not an organization." (Smolka Decl. Ex. C.)

Recent Critical Mass bike rides have not been without incident. During the July 30th bike ride, many of the 4,000 cyclists rode into the Battery Park underpass and onto the F.D.R. Drive. Smolka Decl. P 5.) Once there, some cyclists blocked entrances and exits, and traffic on the F.D.R. Drive came to a standstill. (Smolka Decl. P 5.) The August bike ride lasted nearly three hours with groups of cyclists proceeding north on Fifth Avenue against traffic and later splintering throughout the East Village. (Smolka Decl. P 6.) Intersections were blocked, midtown traffic was snarled and 264 participants were arrested. (Compl. P 20; Smolka Decl. P 6.)

In an effort to avoid the problems that marred these rides, the City attempted to locate an organization that would apply for a parade permit for the September 24, 2004 bike [**5] ride. (Albano Decl. PP 8-9.) Although the City was unsuccessful (Albano Decl. P 10), the police and an attorney for the New York Civil Liberties Union defused a threatened confrontation and agreed on a route moments before for the bike ride began: from Union Square, north on Park Avenue, west on 57th Street,

south on Seventh Avenue to Union Square via 17th Street. (Smolka Decl. P 8; Letter to the Court from Christopher Dunn, dated Oct. 27, 2004.) while most participants adhered to the route, some broke off at Park Avenue and 49th Street and then turned north on Fifth Avenue against traffic. (Smolka Decl. P 9.) Because of traffic congestion at Seventh Avenue and 34th Street, another group, including the Plaintiffs, turned east on 36th Street toward Sixth Avenue. (Smolka Decl. PP 10-11.) A phalanx of police officers i on scooters interdicted the 36th Street riders between Fifth and' Sixth Avenues. (Affidavit of Rebecca Bray, dated Oct. 18, 2004 ("Bray Aff.") P 3; Affidavit of Dan Fennessey, dated Oct. 18, 2004 ("Fennessey Aff.") P 5; Affidavit of Justin McSimov, dated Oct. 18, 2004 ("McSimov Aff.") P 4; Affidavit of Allen Regar, dated Oct. 18, 2004 ("Regar Aff.") P 3; Affidavit of Thomas [**6] Stephanos, dated Oct. 18, 2004 ("Stephanos Aff.") P 4.) While eight cyclists were arrested, the Plaintiffs dismounted and locked their bicycles to parking meters, lampposts and stop signs. (Bray Aff. P 4; Fennessey Aff. P 6; Regar Aff. P 4; Stephanos Aff. P 4.) [*485] Each of the Plaintiffs then left the immediate scene.

When they returned ten to thirty minutes later, one plaintiff found his $110 Kryptonite lock cut in half and his bicycle removed. (Fennessey Aff. P 8.) Three others discovered police in the process of sawing off their locks and seizing their bicycles. (Bray Aff. P 5; McSimov Aff. PP 6-8; Stephanos Aff. PP 5-6; Compl. Ex. A.) Plaintiffs who tried to stop the police and prove that the bicycles belonged to them were rebuffed. (McSimov Aff. P 7; Regar Aff. PP 5-6.) Plaintiff Regar was told that he could recover his bicycle only if he produced a bill of sale. (Regar Aff. P 6.) Since that time, the Plaintiffs have reclaimed their bicycles. The Police Department had custody of Plaintiffs' bicycles for periods ranging from three hours to three weeks. 1 (Bray Aff. PP 7-8; McSimov Aff. P 9; Stephanos Aff. P 8.) While, the city intended to give notices of violation to each Plaintiff, [**7] and anyone else whose bicycle was seized, no notices were issued. (Albano Decl. P 16.) Seeking to pre-empt charges of retaliation, the City refrained from issuing violations when Critical Mass participants asked to lodge complaints at the time they reclaimed their bicycles. (Albano Decl. P 16.)

The City maintains that Critical Mass cyclists violate traffic regulations and interfere with pedestrian and vehicular traffic by riding through Manhattan streets en masse. (Answer P 32.) As Critical Mass participants assembled in Union Square on September 24th, the New York City Police Department circulated a flyer describing the parade permit requirement and applicable traffic rules. (Albano Decl. Ex. D.) The flyer stated that "bicyclists must ride in usable bicycle lanes or near the curb or edge of the road-

346 F. Supp. 2d 480, *485; 2004 U.S. Dist. LEXIS 21661, **7

way, and not ride more than two abreast" and "may not impede pedestrian or vehicular traffic." (Albano Decl. Ex. D.) The flyer also warned that "violators . . . are subject to arrest and bicycle seizure." (Albano Decl. Ex. D.)

New York City's Administrative Code prohibits any "procession, parade, or race" on City streets or in public places absent a parade permit issued by the Police [**8] Department. *N.Y.C., Admin. Code § 10-110(a).* The Police Department issues parade permits for events involving other "loosely associated" individuals, such as the annual Greenwich Village Halloween Parade, and has not denied a parade permit for a bicycle event in the past three years. (Albano Decl. PP 9, 11.) Nevertheless, no one has ever sought a New York City parade permit for a Critical Mass bike ride. (Albano Decl. P 7.) In fact, Time's Up!'s website advises those interested in joining a Critical Mass bike ride not to get a permit, reasoning that "the point of Critical Mass is that biking is a right, not a privilege." (Albano Decl. Ex. C.) This same group proclaims, "We're not blocking traffic, we are traffic!" (Albano Decl. Ex. A.)

The City has offered varying rationales for its seizure of Plaintiffs' bicycles. On September 24th, the Police Department told Plaintiffs that their bicycles were seized because they were abandoned property. (McSimov Aff. P 8.) Plaintiffs were also told that it was illegal to secure bicycles to City property. (McSimov Aff. P 8.) In this litigation, the City asserts that it was illegal for Plaintiffs to leave their bicycles "unattended on a public [**9] street, whether or not they are chained to traffic signs or parking meters." (Def. Mem. at 10.) The City argues that this regulation, *N.Y.C. Admin. Code § 16-122(b)*, was enforced against Plaintiffs by seizing their bicycles to "redress [their] participation, and prevent their continued participation, in the September Critical Mass bike ride, an unlawful bicycle procession that was [*486] dangerous to public safety." (Def. Mem. at 11.)

This action has been litigated at flank speed. Plaintiffs filed their Complaint and moved for a preliminary injunction on October 20, 2004. At a scheduling conference the following day, the City announced its intention to move for a preliminary injunction as well. Because of the urgency of the issues, the parties agreed to an abbreviated motion schedule. On October 25, the City answered the Complaint, counterclaimed for a reverse class action and moved for a preliminary injunction. Plaintiffs replied and opposed the City's motion on October 27. This Court heard argument later that day.

Plaintiffs seek a preliminary injunction prohibiting the City from seizing bicycles of Critical Mass participants unless those individuals are charged with a crime. Given [**10] their experience on September 24, Plaintiffs

claim to be apprehensive about the possible deprivation of their property if they participate in the October 29th bike ride. They assert that the seizure of their bicycles without notice violates due process and infringes their *First Amendment* rights to free speech and free association. Nonetheless, in a last-minute salvo, Plaintiffs assert that they "intend to participate" in the October 29th bike ride and "to endeavor to abide by applicable vehicle and traffic laws." (E.g., Affidavit of Rebecca Bray, dated Oct. 28, 2004 ("Bray Supp. Aff.") P 8.) The City seeks to enjoin preliminarily the Plaintiffs and others with notice from participating in the October 29th bike ride and subsequent Critical Mass events unless parade permits are issued by the Police Department.

## DISCUSSION

### I. Preliminary Injunction Standard

"Preliminary injunctive relief is an extraordinary remedy and should not be routinely granted." *Patton v. Dole, 806 F.2d 24, 28 (2d Cir. 1986)*; accord *No Spray Coalition, Inc. v. City of New York, 252 F.3d 148, 150 (2d Cir. 2001).* A party seeking a preliminary injunction must demonstrate: [**11] "(1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." *Bronx Household of Faith v. Bd. of Educ., 331 F.3d 342, 348-49 (2d Cir. 2003).* Where the movant seeks to enjoin "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," an injunction will issue only if the movant can establish a likelihood of success. *Bery v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996)* (quotations omitted). Moreover, when the injunction would alter rather than maintain the status quo, the standard is elevated to a "clear or substantial likelihood of success." *Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24-25 (2d Cir. 2004).*

### II. Plaintiffs' Motion for a Preliminary Injunction

Plaintiffs seek an injunction preventing the Police Department from seizing the bicycle of any participant in a future Critical Mass bike ride if that participant has not been charged with a crime or violation [**12] of law. Because Plaintiffs seek to stay actions taken pursuant to the City's police power, they must establish irreparable harm and a likelihood that they will succeed on the merits of their claim.

The harm Plaintiffs anticipate must be both irreparable and likely to occur. See *Citibank, N.A. v. Citytrust, 756 F.2d 273, 275 (2d Cir. 1985).* "The necessary determination is that there exists some [*487] cognizable danger of

03/17/2008  03:20  00000000  LAW OFFICE  PAGE  05

Case 1:08-cv-01855-SAS  Document 3-2  Filed 03/17/2008  Page 5 of 16

346 F. Supp. 2d 480, *487; 2004 U.S. Dist. LEXIS 21661, **12

Page 4

recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W. T. Grant Co., 345 U.S. 629, 633, 97 L. Ed. 1303, 73 S. Ct. 894 (1953).* A plaintiff may demonstrate that an injury is likely to occur if the plaintiff has been injured previously by a pattern of officially sanctioned conduct. See *Armstrong v. Davis, 275 F.3d 849, 861 (9th Cir. 2001).* Where a defendant has previously engaged in a pattern of similar acts, there is a sufficient likelihood that it will do so again in the near future. See *Armstrong, 275 F.3d at 861; Roe v. City of New York, 151 F. Supp. 2d 495, 503 (S.D.N.Y. 2001)* ("There is no per se rule requiring more than one past act, [**13] or any prior act, for that matter, as a basis for finding a likelihood of future injury."); *SEC v. Cap, Growth Co., S.A. (Costa Rica), 391 F. Supp. 593 (S.D.N.Y. 1974)* (reasonable likelihood of future activity, and thus imminent harm, could be inferred from past activities even if they had already ceased); see also *New Hampshire Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996)* ("[A] credible threat of present of future prosecution itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement.").

On September 24, 2004, police officers confiscated Plaintiffs' bicycles without citing them for any violation. (Bray Aff. P 5; Fennessey Aff. P 8; McSimov Aff. PP 6-8; Regar Aff. P 7; Stephanos Aff. PP 5-6.) The officers on 36th Street acted on the orders of their commanding officers, who had issued similar orders on other occasions. (Albano Decl. P 14; Smolka Decl. P 12.) Moreover, at the hearing, the City declined to rule out the seizure of unattended bicycles on October 29. (Tr. at 33.) Given that the conduct Plaintiffs complain about appears to have occurred in the past as [**14] a matter of departmental routine, the threat of imminent injury exists. See *Armstrong, 275 F.3d at 861; New Hampshire Right to Life, 99 F.3d at 13; Roe, 151 F. Supp. 2d at 503.* n1

> n1 This case is distinguishable from *City of Los Angeles v. Lyons, 461 U.S. 95, 96-97, 75 L. Ed. 2d 675, 103 S. Ct. 1660 (1983),* where the Supreme Court found that there was no threat of imminent injury, since the Court refused to assume that the plaintiff would violate the law as he had done previously, and thus subject himself to the police department's retribution. Here, by contrast, Plaintiffs clearly intend to participate in the October 29th bike ride. (Bray Aff. P 9; Fennessey Aff. P 10; McSimov Aff. P 10; Regar Aff. P 11; Stephanos Aff. P 11.)

As to the likelihood of success element, because the

proposed injunction is "tailored to a single event, [and] not an injunction against general enforcement of a detailed regulatory scheme," it is prohibitory rather than mandatory. [**15] *Metro. Council, Inc. v. Safir, 99 F. Supp. 2d 438, 443 (S.D.N.Y. 2000)* ("Nothing in the proposed injunction would bar the City from a future criminal prosecution of the . . . participants."); see *Sunward Elecs., 362 F.3d at 24-25.* Accordingly, Plaintiffs need only demonstrate a likelihood – not a substantial likelihood – of success on the merits to prevail on their motion for a preliminary injunction. See *Metro. Council, 99 F. Supp. 2d at 443.*

### A. *First Amendment* Claims

"The loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns, 427 U.S. 347, 373, 49 L. Ed. 2d 547, 96 S. Ct. 2673 (1976).* However, "in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between [*488] the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights." *Bronx Household, 331 F.3d at 350.* Thus, Plaintiffs asserting *First Amendment* chilling effects claims need to articulate [**16] a specific future harm or, at least, the threat of such harm. See *Laird v. Tatum, 408 U.S. 1, 14, 33 L. Ed. 2d 154, 92 S. Ct. 2318 (1972); Bronx, Household, 331 F.3d at 350.* Theoretical or conjectural harm is insufficient. See *Latino Officers Ass'n v. Safir, 170 F.3d 167, 171 (2d Cir. 1999).*

Plaintiffs' participation in the Critical Mass bike rides constitutes "expressive association" entitled to *First Amendment* protection. See *Roberts v. United States Jaycees, 468 U.S. 609, 617-18, 82 L. Ed. 2d 462, 104 S. Ct. 3244 (1984); Sanitation & Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 995-96 (2d Cir. 1997).* This freedom protects the rights of individuals to associate for the purpose of participating in activities protected by the *First Amendment*, including speech, assembly and religion. *Roberts, 468 U.S at 618.* "The right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends" has long been accorded *First Amendment* protection. See *Roberts, 468 U.S. at 622; NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907-09, 73 L. Ed. 2d 1215, 102 S. Ct. 3409 (1982).* [**17]

Plaintiffs maintain that the Critical Mass rides are intended to promote the environmental and aesthetic benefits of alternative modes of transportation. (Compl. P 16.) Because they are meant to espouse a view on an issue of public import – namely, the environment – the Critical Mass bike rides fall within the expansive sweep of ac-

Page 5

346 F. Supp. 2d 480, *488; 2004 U.S. Dist. LEXIS 21661, **17

tivities deemed "expressive association." See *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 443 (3d Cir. 2000)* ("The Supreme Court has cast a fairly wide net in its definition of what comprises expressive activity."); see *BSA v. Dale, 530 U.S. 640, 649, 147 L. Ed. 2d 554, 120 S. Ct. 2446 (2000)* (holding that Boy Scouts engage in expressive association given that their mission is to "instill values in young people"); *Roberts, 468 U.S. at 612-13* (finding that group was engaged in expressive association where its purpose was to foster "a spirit of genuine Americanism and civic interest").

Plaintiffs claim to be fearful of participating in the October 29th bike ride because of the threat that the police will confiscate their bicycles as they did at the last Critical mass event. (Bray Aff. P 9; Fennessey [**18] Aff. P 10; McSimov Aff. P 10; Regar Aff. P 11; Stephanos Aff. P 11.) Importantly, despite their trepidation, Plaintiffs nevertheless intend to participate in the October 29th bike ride. (Bray Supp. Aff. P 8; Affidavit of Dan Fennessey, dated Oct. 28, *2004 P 8*; Affidavit of Justin McSimov, dated Oct. 28, *2004 P 8*; Affidavit of Allen Regar, dated Oct. 28, *2004 P 8*; Affidavit of Thomas Stephanos, dated Oct. 28, *2004 P 8*.)

Plaintiffs have not demonstrated that the chilling effect on their *First Amendment* rights is tangible enough to constitute irreparable harm. A *First Amendment* chill that is conjectural is insufficient to establish the threat of irreparable injury. See *Latino Officers, 170 F.3d at 171.* In Latino Officers, the Second Circuit considered a Police Department policy that officers notify the Department before speaking publicly to outside groups. The Court of Appeals held that, while some officers might be more reluctant to speak because of that regulation, the theoretical possibility of a chilling effect [*489] was insufficient to establish irreparable injury. See *Latino officers, 170 F.3d at 171.* [**19] Here, Plaintiffs, while, asserting concerns about the possible seizure of their bicycles, nevertheless do not intend to forego the opportunity to join in the October 29th bike ride. Thus, Plaintiffs offer insufficient evidence that the alleged harm will curtail their expressive activity. Cf. *Bronx Household, 331 F.3d at 350* (finding irreparable harm where the alleged *First Amendment* deprivation resulted directly from a City Board of Education policy barring religious services or instruction in schools).

**B. Due Process Claims**

1. Irreparable Harm

Plaintiffs claim that the City deprived them of their bicycles without due process and is likely to do so in future critical mass bike rides, in violation of the *Fifth* and *Fourteenth Amendments.* Plaintiffs' allegation of constitutional injury satisfies the irreparable harm prong of the preliminary injunction analysis. See *Statharos v. New York City Taxi & Limousine Comm'n, 198 F.3d 317, 322 (2d Cir. 1999)* ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary.").

2. Likelihood of Success

To succeed on their due process claims, [**20] Plaintiffs will have to show (a) a protected property interest and (b) a deprivation of property (c) without an adequate notice and opportunity to be heard. *McMenemy v. City of Rochester, 241 F.3d 279, 285-86 (2d Cir. 2001).*

Due process protections extend to all property interests, without regard to the relative importance or necessity of the property at issue. *Fuentes v. Shevin, 407 U.S. 67, 89-90, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972)* (recognizing a valid property interest over household goods such as a stove and a stereo). While one plaintiff is a recreational cyclist, the others use their bicycles as their principal mode of transportation, and for one, his bicycle is indispensable to his employment as a messenger. (Bray Aff. P 2; Fennessey Aff. P 2; McSimov Aff. P 2; Regar Aff. P 2; Stephanos Aff. P 2.) Thus, there is no dispute that Plaintiffs have a valid property interest in their bicycles.

Further, even a temporary deprivation of property is sufficient for due process purposes. *Connecticut v. Doehr, 501 U.S. 1, 12, 115 L. Ed. 2d 1, 111 S. Ct. 2105 (1991); Fuentes, 407 U.S. at 85; Krimstock v. Kelly, 306 F.3d 40, 51 (2d Cir. 2002).* [**21] The fact that Plaintiffs ultimately recovered their bicycles is immaterial. See *United States v. Monsanto, 924 F.2d 1186, 1192 (2d Cir. 1991)* (holding that a "temporary and nonfinal . . . removal is, nonetheless, a deprivation of property' subject to the constraints of due process"). As a result of the City's actions, Plaintiffs were deprived of their bicycles from the time that they were seized until Plaintiffs reclaimed them, and their bicycle locks were destroyed. (Bray Aff. ¶¶ 7-8; Fennessey Aff. PP 8-9; McSimov Aff. P 9; Regar Aff. PP 7-8; Stephanos Aff. P 8.) Plaintiffs have established that they were deprived of their property. See *Fuentes, 407 U.S. at 86* ("The *Fourteenth Amendment* draws no bright lines around three-day, 10-day or 50-day deprivations of property.")

"The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and an opportunity to meet it." *Mathews v. Eldridge, 424 U.S. 319, 348, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976)* (internal quotation marks and alterations omitted). The *Fifth* and *Fourteenth Amendments* [*490] generally require notice and a hearing prior to a property [**22] deprivation. *United States v. James Daniel Good Real Prop., 510 U.S. 43, 53, 126 L. Ed. 2d 490, 114 S. Ct.*

Page 6

346 F. Supp. 2d 480, *490; 2004 U.S. Dist. LEXIS 21661, **22

*492 (1993)*. Failure to provide a predeprivation notice and hearing will pass constitutional muster only in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *James Daniel Good, 510 U.S. at 53*. Even in such extraordinary situations, however, adequate notice and a hearing must be afforded after the deprivation occurs. See *Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 881 (2d Cir. 1996)* ("HANAC's [due process] claims can survive only if New York does not provide adequate postdeprivation procedures.")

The City does not dispute that Plaintiffs were denied a hearing prior to the seizure of their bicycles. Rather, the City contends that the exigencies of the September 24, 2004 Critical Mass bike ride and the clear nature of Plaintiffs alleged violation excused the traditional requirement of a predeprivation hearing.

Assuming arguendo that Plaintiffs violated *§§N.Y.C. Admin. Code 16–122* when they left their bicycles unattended [**23] along 36th Street, the City had a legitimate governmental interest in enforcing the regulation to facilitate traffic and ensure the safety of the sidewalk. This Court will not second-guess the police supervisors' assessment of the situation on 36th Street on Plaintiffs' motion for a preliminary injunction.

Had the police delayed the seizures and left the bicycles unguarded, Plaintiffs could have unlocked them and gone home or created a new disruption on 36th Street. See *Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 679, 40 L. Ed. 2d 452, 94 S. Ct. 2080 (1974)* (holding notice and hearing prior to seizure impracticable where the property could be easily "removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given"); cf. *James Daniel Good, 510 U.S. at 57* (holding that predeprivation notice and hearing were required before seizure of a home "because real property cannot abscond"). The circumstances presented by a chaotic Friday evening in midtown Manhattan were not conducive to a meaningful pre-seizure hearing on 36th Street.

The evidence on the motion reveals that the City never informed Plaintiffs of the regulation supposedly justifying the bicycle seizures [**24] until this litigation. Procedural due process requires that a person be given "reasonable notice of a charge against him, and an opportunity to be heard in his defense." *In re Oliver, 333 U.S. 257, 273, 92 L. Ed. 682, 68 S. Ct. 499 (1948)*; see *Brown v. Ashcroft, 360 F.3d 346, 350–351 (2d Cir. 2004)* ("At the 'core' of due process is the right to notice of the nature of the charges and a meaningful opportunity to be heard." (internal quotation marks omitted)). Plaintiffs were entitled to be told what the charges against them were. *Cleveland*

*Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985)*. While the Police Department flyer circulated to bicyclists in Union Square on September 24th warned that violations of the parade permit and vehicle and traffic laws could result in arrest and bicycle seizure, it did not mention any consequence for leaving bicycles unattended on the sidewalk. (Albano Decl. Ex. D.)

The notion that *Section 16–122* was the trigger for the bicycle seizures on 36th Street only surfaced on October 25th in the City's Answer with Counterclaim. Indeed, the City's affidavits reveal that the Police Department intended to [**25] issue notices of violation to Plaintiffs when they [*491] reclaimed their bicycles. (Albano Decl. P 16.) As previously noted, the Police Department refrained from issuing citations to Plaintiffs because of its concern that notices of violation would spawn retaliation claims. (Albano Decl. P 16.) Because of the City's failure to provide Plaintiffs with notice of the charges against them, Plaintiffs are likely to succeed on the merits of their due process claims. Accordingly, a preliminary injunction is warranted to prevent a recurrence of bicycle seizures as they occurred on September 24.

### III. The City's Motion for a Preliminary Injunction

In a reflex action, the City moves for a preliminary injunction to enjoin Critical Mass bike rides absent a parade permit. The City acknowledges that the bike rides have been spiraling out of control since the July 30th bike ride that paralyzed the F.D.R. Drive. (Tr. at 28.) Apparently, for months, the City has contemplated state court litigation to enforce its parade permit regulations. (Tr. at 28–29.) Despite the calendar's ineluctable advance toward the last Friday of each month, the City endured turbulence on August 27 and September 24 without [**26] seeking redress in the state courts. Even with the Halloween bike ride looming, the City did not file suit until after it was served with Plaintiffs' Complaint.

Now, in the context of a circumscribed application by Plaintiffs, the City seeks sweeping relief under a weft of City regulations to enjoin bike rides that have occurred monthly for more than six years. Indeed, at the hearing, the City conceded that it could not pursue its requested relief under *N.Y Vehicle and Traffic Law § 1234* because that state statute was superseded by City regulations. (Tr. at 36.) This Court declines the City's invitation to wander into a Serbonian bog before a state court has had an opportunity to illumine the path.

Plaintiffs argue that the doctrine of laches prohibits the City from obtaining equitable relief. Where the non-movant raises a potentially meritorious laches defense, it is appropriate to consider that issue in the preliminary

03/17/2008   03:20   00000000                         LAW OFFICE                              PAGE   08

Case 1:08-cv-01855-SAS   Document 3-2   Filed 03/17/2008   Page 8 of 16

Page 7

346 F. Supp. 2d 480, *491; 2004 U.S. Dist. LEXIS 21661, **26

injunction context. See *Nat. Council of Arab Americans v. City of New York, 331 F. Supp. 2d 258, 265 (S.D.N.Y. 2004)*; accord *Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 132 (2d Cir. 2003)*. Laches "bars injunctive [**27] relief where a plaintiff unreasonably delays in commencing an action." *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., 17 F.3d 38, 44 (2d Cir. 1994)*. The doctrine reflects the principle that "he who comes into equity must come with clean hands." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2002)* (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814, 89 L. Ed. 1381, 65 S. Ct. 993 (1945))*. Grounds for laches exist when a plaintiff unreasonably and inexcusably delays in seeking an injunction, and the defendant is prejudiced by that delay. *Perez v. Danbury Hosp., 347 F.3d 419, 426 (2d Cir. 2003)*; *Robins Island Pres. Fund, Inc. v. Southold Dev. Corp., 959 F.2d 409, 423 (2d Cir. 1992)*; *Nat. Council of Arab Americans, 331 F. Supp. 2d at 265*.

As previously noted, the City has been aware of the Critical Mass bike rides "for a number of years." (Answer P 31.) The problems with recent rides have been chronicled earlier in this Memorandum and Order. And, even when the bike rides were uneventful (e.g., July 2003), a thousand bicyclists traveling [**28] on congested streets poses a logistical challenge for the police. But nothing was done. (Answer P 31.)

[*492] The City does not even try to justify its delay. By attempting to use this litigation as its platform, the City has injected a slew of important and complex issues into this action. With only two days to respond to the City's application, the Plaintiffs are prejudiced, and the Court is short-changed. See *Irish Lesbian & Gay Org. v. Giuliani ("ILGO"), 918 F. Supp. 732, 748-49 (S.D.N.Y. 1996)* (finding prejudice to defendants in the "preparation and presentation of their respective cases" where plaintiff sought to enjoin the issuance of a parade permit only 19 days before the parade and over one month after the permit had been denied). While not necessarily unconscionable, see *New Era Publ'ns Int'l, ApS v. Henry Holt & Co., Inc., 873 F.2d 576, 584-84 (2d Cir. 1989)*, the City's delay is one of the equities that argues strongly against granting its application for a preliminary injunction. *ILGO , 918 F. Supp. at 749*. Accordingly, this Court finds the City's application for a preliminary injunction is barred by laches.

Even if the doctrine [**29] of laches was not a bar, the need to adjudicate novel and complex state law issues militates against the exercise of supplemental jurisdiction. See *Jinks v. Richland County, S.C., 538 U.S. 456, 459, 155 L. Ed. 2d 631, 123 S. Ct. 1667 (2003)*. District courts may decline to exercise supplemental jurisdiction

under *28 U.S.C. § 1367* where it would undermine judicial economy, fairness and comity. See *Jones v. Ford Motor Credit Co., 358 F.3d 205, 214 (2d Cir. 2004)*. Thus, where pendant claims hinge on unresolved issues of state law, "especially when those questions concern the state's interest in the administration of its government," the principles of comity and federalism weigh heavily in favor of leaving such decisions to the state courts. *Valencia ex rel. Franco v. Lee, 316 F.3d 299, 306 (2d Cir. 2003)*.

## CONCLUSION

Critical Mass appears to be a surging phenomenon in New York. However, the event's success is spawning potential dangers to participants as well as the citizenry of New York. Several thousand cyclists cannot simply go "wherever their wheels take them" month after month without someone getting hurt. Bike rides [**30] of this magnitude require coordination with the police for everyone's safety. Both sides in this litigation need to overcome their preoccupation with the formalism of the parade permit process. In the end, Critical Mass is people, not an event, and they need to take responsibility. Given the fluidity of this matter, the best way to ensure the safety of law-abiding Critical Mass participants is for cyclists and the police to agree each month on the route that the Friday evening bike ride will take.

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is granted in part, and the City's motion for a preliminary injunction is denied. Specifically, the City and its police officers and agents are preliminarily enjoined from seizing bicycles used by participants in the October 29, 2004 Critical Mass bike ride unless said participants are provided with notice of the reasons for seizure or they are charged with a crime or violation of law. This preliminary injunction does not restrain the City and its police officers and agents from enforcing the law or from seizing unattended bicycles during the October 29, 2004 Critical Mass bike ride which obstruct vehicular or pedestrian [**31] traffic.

The parties are directed to report in writing to the Court by November 5, 2004 concerning any difficulties encountered in implementing this preliminary injunction in anticipation of a further Order in advance [*493] of the November 26, 2004 Critical Mass bike ride.

Dated: October 28, 2004

New York, New York

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.

**Exhibit 2**

favaro - biking_1 (2160x1440x16M jpeg)



# Exhibit 3

favaro c n 0305 (2272x1704x16M jpeg)



# Exhibit 4

favaro2 cm 0305 (2272x1704x16M jpeg)



**Exhibit 5**

bike outside of bike jail (1600x1200x16M jpeg)



Case 1:08-cv-01855-SAS    Document 3-3    Filed 03/17/2008    Page 1 of 15

# Exhibit 6

rossbike (504x359x16M jpeg)



**Exhibit 7**

bikes released from jail 3-05 (1280x960x16M jpeg)



# Exhibit 8

Marilyn Horan bike (617x740x16M jpeg)



**Exhibit 9**

MH bike on NYPD truck 2.25.05 (768x497x16M jpeg)



# Exhibit 10

660778-R1-3A (768x497x16M jpeg)



660778-R1-4A (768x497x16M jpeg)



**Exhibit 11**

mike green bike parked (443x281x16M jpeg)



# Exhibit 12

mike green bike in nypd van (375x500x16M jpeg)

